NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

U.S. District Court
No. 2006-745

ENERGYNORTH NATURAL GAS, INC.

v.

CERTAIN UNDERWRITERS AT LLOYD'S & a.

Argued: May 9, 2007
Opinion Issued: October 18, 2007

McLane, Graf, Raulerson & Middleton, P.A., of Manchester (Bruce W. Felmly & a. on the brief, and Mr. Felmly orally), for the plaintiff.

Boutin & Altieri, P.L.L.C., of Londonderry (Edmund J. Boutin on the brief), and Bates & Carey LLP, of Chicago, Illinois (Mark G. Sheridan and David M. Alt on the brief, and Mr. Sheridan orally), for defendant American Re-Insurance Company.

Boutin & Altieri, P.L.L.C., of Londonderry (Edmund J. Boutin on the brief), for Century Indemnity Company, as amicus curiae.

McNeill, Taylor & Gallo, P.A., of Dover (Stephen H. Roberts on the brief), for Complex Insurance Claims Litigation Association, as amicus curiae.

DUGGAN, J.  The United States District Court for the District of New Hampshire (Barbadoro, J.) certified the following questions of law, see Sup. Ct. R. 34:

> 1. When an insurance policy is triggered by the continuous migration of toxic waste that began before coverage commenced and continued after coverage ended, and the evidence will not permit a determination as to when specific property damage occurred, is the insurer jointly and severa[l]ly liable for all of the resulting property damage up to the limits of the policy?
>
> 2. If the answer to question 1 is no, how should the insurer's share of any liability be determined?
>
> 3. If the answer to question 1 is yes, what is the effect of prior settlements with other insurers?
>
> 4. Does a policy holder become immediately entitled to an award of costs and reasonable attorneys' fees under RSA [ ]491:22-b by obtaining rulings against an excess insurer that will require the insurer to indemnify the policy holder if it incurs enough recoverable costs in the future to reach the coverage provided by the excess insurer?

We adopt the parties' joint statement of relevant facts as well as the district court's recitation of facts.  This is an environmental insurance coverage case.  The plaintiff, EnergyNorth Natural Gas, Inc. (EnergyNorth), is the successor to a company that operated a manufactured gas plant (MGP) in Manchester.  The MGP began operating in 1852 and ceased operations in or about 1952.  On March 13, 2000, the New Hampshire Department of Environmental Services notified EnergyNorth of pollution damage at the Manchester site and required it to undertake investigative and remedial action, which is ongoing.

EnergyNorth brought this declaratory judgment and breach of contract action against various insurance companies to recover costs that it incurred in the past and expects to incur in the future to respond to the environmental damage caused by the MGP's operations.  The various policies issued by these insurance companies first became effective as early as 1939 and continued until 1986.  EnergyNorth settled its claims with all of the insurers except defendant American Re-Insurance Company (American Re).  Some or all of the settlements into which EnergyNorth entered with the other insurers are broader than the Manchester site cleanup at issue in this action.

2

American Re provided third-level excess liability insurance coverage to one of EnergyNorth's predecessors from January 1, 1972, until January 1, 1973. The American Re policy contains a limit of liability of $2,000,000 in excess of $3,000,000 of underlying excess coverage. It is an indemnity-only policy that does not contain a duty to defend. The American Re policy applied "only to accidents or occurrences" happening between January 1, 1972, and January 1, 1973. The policy required American Re to indemnify EnergyNorth "against ultimate net loss in excess of and arising out of the hazards covered and as defined and in excess of the underlying insurance . . . but only up to an amount not exceeding the limit(s) shown in Item 5 of the Declarations." Item 5 of the Declarations set forth limits of: "$2,000,000 each occurrence and annual aggregate where applicable in excess of $3,000,000 and underlying insurance as shown in Item 4 (a) and (b) above." Under the American Re policy, American Re's "obligation to pay any ultimate net loss and costs with respect to any accident or occurrence falling within the terms of this Certificate shall not attach until the amount of the applicable underlying limit has been paid by or on behalf of the Insured on account of such accident or occurrence." The term "ultimate net loss" was defined as "the sums paid in settlement of losses for which the Insured is liable after making deductions for all recoveries, salvages and other insurances . . . whether recoverable or not, and shall exclude all 'Costs.'"

The American Re policy provided that its coverage "shall follow the insuring agreements, conditions and exclusions of the underlying insurance . . . immediately preceding the layer of coverage provided by this [policy]," except "as may be inconsistent with this [policy]." The policy immediately underlying the American Re policy was a Home Insurance Company policy. The Home policy's coverage provision stated:

> The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemni[f]y the Insured for all sums which the Insured shall be obligated to pay by reason of the liability . . . imposed upon the Insured by Law, . . . for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss" on account of . . . Property Damage . . . caused by or arising out of each occurrence or happening anywhere in the world.

The Home policy defined "occurrence" as:

> The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the

same general conditions arising at or emanating from one premises location shall be deemed one occurrence.

Additionally, the Home policy contained an "other insurance" clause that provided:

> If other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this Policy, other than Insurance that is in excess of the Insurance afforded by this Policy, the Insurance afforded by this Policy shall be in excess of and shall not contribute with such other Insurance, either as double Insurance or otherwise. Nothing herein shall be construed to make this Policy subject to the terms, conditions, and limitations of other Insurance.

EnergyNorth has asserted, and American Re does not contest, that the pollution damage, which EnergyNorth has been required to investigate and clean up, was caused predominately by inadvertent leaks and spills during all the years of MGP operations at the site, particularly from gas holders and associated piping. EnergyNorth has also asserted, and American Re does not contest, that tar, which is now considered to be a "hazardous waste," was discharged and continuously migrated through soil and groundwater at the site, causing continuous property damage as it moved. EnergyNorth and American Re agree that property damage was continuous, beginning with the commencement of operations at the Manchester site, and that the evidence does not permit a determination of precisely when specific property damage took place.

In light of our decision in <u>EnergyNorth Natural Gas v. Underwriters at Lloyd's</u>, 150 N.H. 828, 835-36, 838, 840-41 (2004) (<u>EnergyNorth I</u>), in which we held that the continuous migration of toxic waste can trigger coverage under multiple insurance policies covering different periods if the policies include certain coverage terms, EnergyNorth and American Re agree that: (1) the costs that EnergyNorth is seeking to recover in the instant case were incurred in responding to the continuous migration of toxic waste that was ongoing while the American Re policy was in effect; (2) the American Re policy uses language that can result in coverage being triggered by the migration of toxic waste during the policy period; and (3) the contamination at or emanating from the Manchester site was caused by fortuitous events and, therefore, arose from an "occurrence" within the meaning of the American Re insurance policy.

A

The questions certified to the court in this case derive from our decision in <u>EnergyNorth I</u>, in which we defined the "'trigger-of-coverage' standard" that

4

"should be applied under New Hampshire law to determine the point at which an 'accident' or 'occurrence' causing 'property damage' took place," where the damage at issue consisted of toxic wastes that discharged into the environment and continuously migrated through soil and groundwater at various MGP sites. EnergyNorth I, 150 N.H. at 829-30 (quotations omitted). In that case, after describing the four general approaches to determining how coverage under an insurance policy is triggered in such cases, we examined the policies at issue. Id. at 831-32. With respect to three of the occurrence-based policies, we concluded that their language "embodie[d] an 'injury-in-fact' trigger, and where the alleged contamination and property damage are continuing, 'injuries-in-fact' triggering coverage are also continuing." Id. at 835-36. With respect to another occurrence-based policy and the accident-based policies at issue, we concluded that their language embodied "an exposure trigger, and where the alleged migration of toxic wastes is continuing, multiple exposures triggering coverage are also continuing." Id. at 838, 840-41.

The instant case asks us to address issues related to allocation of damages among multiple triggered insurance policies in a long-term environmental pollution case. These are issues of first impression.

B

"As a framework for our discussion, we take note of the atypical nature of the problem presented when an insured faces liability for long-term environmental pollution that spans multiple successive insurance policy periods." Public Service Co. v. Wallis and Companies, 986 P.2d 924, 935 (Colo. 1999). "The typical occurrence covered by a liability policy is something akin to a car accident. Losses of this nature are relatively easy to identify because damages are both immediate and finite." Id. (quotation omitted). By contrast, in long-term environmental pollution cases, "correlating degrees of damage to particular points along the loss timeline may be virtually impossible[,] [which] has led to substantial uncertainty as to how responsibility for such losses should be allocated where multiple insurers have issued successive policies to the insured over the period of time the damage was developing." Id. (quotation omitted).

EnergyNorth argues that the clear language of the American Re insurance policy requires that we apply joint and several liability to allocating coverage and indemnity obligations. American Re and the amici curiae contend that the clear language mandates allocating by applying a pro rata approach. We briefly explain both approaches.

There are two principal methods of allocating coverage among multiple policies. One way is by applying joint and several liability. Colon, Pay it Forward: Allocating Defense and Indemnity Costs in Environmental Liability

5

Cases in California, 24 No. 2 Ins. Litig. Rep. 43, 51 (2002). Under this approach, "any policy on the risk for any portion of the period in which the insured sustained property damage or bodily injury is jointly and severally obligated to respond in full, up to its policy limits, for the loss." Jones & Hurwitz, An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases, 10 Vill. Envtl. L.J. 25, 37-38 (1999). The policyholder chooses one policy to respond to the claim and then the selected insurer may pursue cross-claims against other carriers whose policies were also available either under the common-law doctrine of contribution or under each policy's "other insurance" clause. Id. at 37; see Keene Corp. v. Ins. Co. of North America, 667 F.2d 1034, 1050 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982). "While termed 'joint and several liability,' this approach is conceptually distinct from the general tort concept of joint and several liability, because under this approach, the jointly liable parties may be partially indemnified by other jointly liable parties." Colon, supra at 51.

The seminal case adopting the joint and several allocation method is Keene Corp. Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 269 (1997). In that case, the United States Court of Appeals for the District of Columbia "held that each triggered insurer was jointly and severally liable for the indemnity and defense costs resulting from a rash of asbestos-related lawsuits against the insured, including periods during which Keene had self-insured." Id.; see Keene Corp., 667 F.2d at 1049-50. The court in Keene Corp. ruled that "the policyholder could seek indemnification from any of the triggered policies it chose, with the stipulation that only one policy's limits could apply to each injury." Jones & Hurwitz, supra at 39; see Keene Corp., 667 F.2d at 1049-50. Thus, the court in Keene Corp. held that the insured was not entitled to stack the limits of liability of the applicable policies. Keene Corp., 667 F.2d at 1049-50.

"Most courts that have adopted the joint and several allocation method allow for the selection of only one policy regardless of whether or not any single policy alone will reimburse the policyholder to the full extent of its liability." Colon, supra at 53. "Other courts will allow 'stacking' if one policy will not cover the policyholder's entire liability." Id. Among the other courts adopting the joint and several liability allocation method, with or without stacking, are appellate courts in Delaware, Illinois, Massachusetts, Ohio, Texas and Washington. See Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 489-91 (Del. 2001); Benoy Motor Sales, Inc. v. Universal, 679 N.E.2d 414, 418 (Ill. App. Ct.), appeal denied, 686 N.E.2d 1148 (Ill. 1997); Rubenstein v. Royal Ins. Co. of America, 694 N.E.2d 381, 388 (Mass. App. Ct. 1998), aff'd in part on other grounds, 708 N.E.2d 639 (Mass. 1999); Goodyear Tire & Rubber v. Aetna Cas. & Sur., 769 N.E.2d 835, 840-41 (Ohio 2002); American Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 855 (Tex. 1994); Am. Nat'l v. B & L Trucking, 951 P.2d 250, 256-57 (Wash. 1998).

Courts applying this approach "usually focus on a policy's 'all sums' language," such as language in which the insurer agrees to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay." 23 E.M. Holmes, Holmes' Appleman on Insurance 2d § 145.4, at 21 (2003) (interim volume) (quotation omitted). These courts interpret the "all sums" language to mean that an insurer must pay "'all sums'" for which the insured is liable, including triggered years in which the insured had no insurance." Id. As EnergyNorth argues in its brief, the "all sums" language "mean[s] that, when multiple policies are triggered to cover the same loss, each policy provides indemnity for the insured's entire liability, and each insurer is jointly and severally liable for the entire claim." Rubenstein, 694 N.E.2d at 388.

The other approach to allocating liability among multiple insurers "is to apply proportional, or pro rata, liability. Under this approach, all the triggered insurers will be allocated a certain portion of the loss." Colon, supra at 51. "The difference between joint and several allocation . . . and pro rata allocation is that pro rata allocation allows the policy holder to recover only a portion of each triggered policy." Bass, The Montrose Decision and Long-Tail Environmental Liability: A New Approach to Allocating Risk Among Multiple Third-Party Insurers, 5 Hastings W.-Nw. J. Envtl. L. & Pol'y 209, 218 (1999). The pro rata approach "emphasizes that part of a long-tail injury will occur outside any particular policy period. Rather than requiring any one policy to cover the entire long-tail loss, [pro rata] allocation instead attempts to produce equity over time." Bratspies, Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies, 1999 BYU L. Rev. 1215, 1232. Whereas the joint and several approach allocates "orphan shares" of liability to insurers, the pro rata approach allocates these shares to the insured. Id. at 1232, 1241-42. "Orphan shares" are shares of liability that might otherwise be attributable to an insolvent insurer, lost insurance policy, or a period without insurance. See id. at 1232.

The pro rata approach "focuses on the definitions of 'occurrence,' 'bodily injury' and 'property damage,' when read in conjunction with the 'Insuring Agreement,' to require the allocation of loss to a particular policy be proportionate to the damage suffered during that policy's term." Holmes, supra at 25; see Ins. Co. North America v. Forty-Eight Insulations, 633 F.2d 1212, 1225 (6th Cir. 1980), clarified, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109 (1981). To courts adopting this method, the phrase "during the policy period" in the policy's definition of "occurrence" limits the promised "all sums" coverage. Bratspies, supra at 1234.

There are two primary means of apportioning liability on a pro rata basis: pro-ration by years and pro-ration by years and limits. Under pro-ration by years, "each triggered policy bears a share of the total damages proportionate

7

to the number of years it was on the risk, relative to the total number of years of triggered coverage." Holmes, supra at 24. "To assign liability to each policy period, a court calculates a fraction -- with the number of years during which the injury occurred as the denominator and the number of years of coverage provided by an insurance policy period as the numerator. Based on this fraction, each policy period would then be assigned its fractional share of the total liability." Bratspies, supra at 1233.

The seminal case advocating this method of allocation is Insurance Co. of North America v. Forty-Eight Insulations, 633 F.2d at 1225. In addition to the Sixth Circuit Court of Appeals, this method has been used by the Fourth and Fifth Circuit Courts of Appeal as well as state appellate courts in Colorado, Maryland, Michigan and Minnesota. See Spartan Petroleum Co. v. Federated Mut. Ins. Co., 162 F.3d 805, 812-13 (4th Cir. 1998); Porter v. American Optical Corp., 641 F.2d 1128, 1145 (5th Cir.), cert. denied, 454 U.S. 1109 (1981); Public Service Co., 986 P.2d at 940; Baltimore v. Utica Mutual, 802 A.2d 1070, 1101-02 (Md. Ct. Spec. App. 2002), appeal dismissed, 821 A.2d 369 (Md. 2003); Arco v. AMICO, 594 N.W.2d 61, 69-70 (Mich. Ct. App. 1999); NSP v. Fidelity & Cas. Co. of New York, 523 N.W.2d 657, 663-64 (Minn. 1994).

The second primary method of pro rating liability among insurers is pro-ration by years and limits, adopted by the New Jersey Supreme Court in Owens-Illinois, Inc. v. United Insurance Co., 650 A.2d 974, 993-94 (N.J. 1994). Under pro-ration by years and limits, loss is allocated among policies "based on both the number of years a policy is on the risk as well as that policy's limits of liability. The basis of an individual insurer's liability is the aggregate coverage it underwrote during the period in which the loss occurred." Holmes, supra at 30. Under this approach, "an insurer's proportionate share is established by dividing its aggregate policy limits for all the years it was on the risk for the single, continuing occurrence by the aggregate policy limits of all the available policies and then multiplying that percentage by the amount of indemnity costs." Colon, supra at 60.

The following hypothetical illustrates the three primary methods of allocating liability among multiple insurers ("joint and several liability without stacking," "pro-ration by years," and "pro-ration by years and limits"): Assume that a company, which was found liable for a $15 million verdict for pollution over twenty years, had insurance with four different primary insurers. Bass, supra at 221. Company A provided $.5 million insurance for five years; Company B provided $1 million insurance for six years; Company C provided $2 million insurance for four years; and Company D provided $4 million insurance for five years. Id.

Under joint and several liability without stacking, the insured would select one company's policies, likely those of Company D because they are the

largest available, and would be indemnified for $4 million of the $15 million verdict. Id. Company D could then seek contribution from Companies A, B and C. Id. at 222.

Under pro-ration by years, Company A would be liable for 25% of the verdict, or $3.75 million, because it was on the risk for five out of the twenty years over which the pollution occurred. Id. Company D would also be liable for 25% of the verdict for the same reason. Id. Company B would be liable for 30% of the verdict, or $4.5 million, because it was on the risk for six out of the twenty years, and Company C would be liable for 20% of the verdict, or $3 million, because it was on the risk for four out of the twenty years. Id.

Under pro-ration by years and limits, Company A would be responsible for 6.85% of the risk. Id. This percentage is derived by dividing its total limit for the five years it was on the risk ($2.5 million) by the total limits of all of the policies during the entire twenty years of pollution ($36.50 million). Id. This percentage is then multiplied by the $15 million verdict to yield $1.0275 million as the total amount of Company A's liability. Id. Company B would be responsible for 16.44% of the risk ($6 million limit divided by $36.50 million) or $2.466 million (16.44% of $15 million). Company C would be responsible for 21.92% of the risk ($8 million limit divided by $36.50 million) or $3.288 million (21.92% of $15 million). Id. Company D would be responsible for 54.80% of the risk ($20 million divided by $36.50 million) or $8.220 million (54.80% of $15 million). Id.

C

In deciding whether a joint and several liability or pro rata allocation method applies in this case, we find the New Jersey Supreme Court's decision in Owens-Illinois instructive. That case involved a declaratory judgment action brought by an asbestos-product manufacturer against its insurers to establish their obligation to provide coverage for certain asbestos-related personal injury and property claims. Owens-Illinois, 650 A.2d at 976, 978. The Chancery Division of the New Jersey Superior Court had decided that: coverage for asbestos-related disease was triggered by "an 'injury in fact'"; the continuous trigger theory applied to property damage; and "all insurers whose policies were triggered [were] jointly and severally liable . . . to the extent of the policy limits." Id. at 978. On appeal, the New Jersey Supreme Court first held that the continuous trigger theory applied to both the personal injury and property damage claims. Id. at 980-85, 995. The court then reviewed whether the language of the policies mandated a particular allocation method. Id. at 988-89. Like EnergyNorth in this case, the manufacturer in Owens-Illinois, relying upon the "all sums" language, contended that the plain meaning of this language was not that the insurer would pay only some of the damages or ultimate net loss sustained, but that it would pay all sums resulting from

9

injury or property damage. Id. at 988. Like American Re here, the insurers in Owens-Illinois, relying upon the phrase "during the policy period," argued that, on their face, the policies did not apply to injuries that occurred outside the policy period. Id.

> The New Jersey Supreme Court found both arguments to be flawed:

> As to the Insurance Companies' argument that all injury (or damages) must occur in the policy period or that indemnity is awarded for only the part of the injury that occurs during the policy period, consider the simple case of an automobile accident in 1994 with a definite prognosis that an injured occupant's spine will deteriorate in 1996 resulting eventually in paralysis. The policy in effect during 1994 must indemnify for all damages attributable to the 1994 accident even though the full extent of the damages or the injury will not take place until a future date. Conversely, to convert the 'all sums' or 'ultimate net loss' language into the answer to apportionment when injury occurs over a period of years is like trying to place one's hat on a rack that was never designed to hold it. It does not work. The language was never intended to cover apportionment when continuous injury occurs over multiple years. In addition, the argument . . . is intuitively suspect and inconsistent with our developing jurisprudence in the field of toxic torts.

Id. at 988-89.

"The problem," the court noted, "is how to apply the abstract concepts of law and the related provisions of the insurance contract to the realities of environmental disease." Id. at 989. With prototypical accidents, "the occurrence . . . and the attendant injuries are easily identified as falling within a particular policy period." Id. This is not the case with the gradual release of environmental contaminants. See id. As another court has observed: "The provisions of . . . insurance policies do not neatly fit the complexities of the factual scenario presented by gradual and continuous environmental pollution that spans several decades and numerous policy periods." Public Service Co., 986 P.2d at 939. Ultimately, the court in Owens-Illinois determined that it could not "find the answer to allocation in the language of the policies." Owens-Illinois, 650 A.2d at 990.

The court then reviewed the drafting history of comprehensive general liability policies and general principles of insurance contract interpretation, but found no answers there, either. See id. at 990-92. The court therefore chose an allocation method based upon the following goals: (1) maximizing resources to cope with environmental injury or damage; (2) giving the greatest incentive

10

to insureds to acquire insurance; and (3) achieving simple justice. Benjamin Moore & Co. v. Aetna Cas., 843 A.2d 1094, 1101 (N.J. 2004); see Owens-Illinois, 650 A.2d at 992. The court held that neither allocation by joint and several liability nor pro-ration by years effectively achieved these goals. Owens-Illinois, 650 A.2d at 992-93. Joint and several liability, the court ruled, "reduces the incentive of property owners to insure against future risks." Id. at 992. Pro-ration by years alone does not adequately take into account "the degree of the risks transferred or retained during the years of exposure." Id. at 993. The court, therefore, adopted pro-ration by years and limits as an allocation method that is "more consistent with the economic realities of risk retention or risk transfer." Id. Although Owens-Illinois concerned asbestos-related injury and damage, the court later applied its holding in Owens-Illinois to a case involving pharmaceutical waste exposure that took place over many years. See Carter-Wallace v. Admiral Ins., 712 A.2d 1116 (N.J. 1998).

We are persuaded by the reasoning of the New Jersey Supreme Court and therefore adopt a pro rata approach to allocating liability among multiple insurers in the instant case. We find pro rata allocation to be superior to joint and several allocation because it is more consistent with the trigger model we adopted in EnergyNorth I. Joint and several liability treats a long-tail environmental exposure injury as one continuous occurrence, with the policy holder choosing which year's policy will pay all the damages that occurred over several years, up to the limits of that policy. See Spaulding Composites v. Aetna Cas., 819 A.2d 410, 419 (N.J. 2003), cert. denied, 540 U.S. 1142 (2004). This is inconsistent with the trigger model we adopted in EnergyNorth I under which the long-tail environmental exposure injury is "treated as one occurrence per year triggering all applicable policies." Id.; see EnergyNorth I, 150 N.H. at 835-36, 838, 840-41. Pro rata allocation, by contrast, guarantees that all of the carriers on the risk during a long-tail environmental exposure injury respond to it. See Bratspies, supra at 1232-33.

Further, a pro rata allocation forces companies to internalize part of the costs of long-tail liability and creates incentives for companies to minimize environmental carelessness by not permitting a policyholder who chooses not to be insured for part of the long-tail injury period to recover as if the policyholder had been fully covered for that period. Id. at 1236-38.

We agree with those courts that have rejected joint and several liability as a method of allocating liability to multiple insurers in long-tail environmental claims. Joint and several allocation "rest[s] on an assumption not in accordance with the development of the law: that at every point in the progression the provable damages due to injury in any one of the years from exposure to manifestation will be substantially the same." Carter-Wallace, 712 A.2d at 1121 (quotation and ellipsis omitted). Further, it "creates a false equivalence between an insured who has purchased insurance coverage

continuously for many years and an insured who has purchased only one year of insurance . . . . Neither logic nor precedent support such a result." Public Service Co., 986 P.2d at 939-40 (quotation omitted).

Moreover, while EnergyNorth argues that the joint and several method protects its "reasonable expectations" under its various insurance policies, "we doubt that [EnergyNorth] could have had a reasonable expectation that each single policy would indemnify [it] for liability related to property damage occurring due to events taking place years before and years after the term of each policy." Id. at 940. Nor could EnergyNorth have had a reasonable expectation that it would be exempt from liability for injuries that occurred during any period in which EnergyNorth was uninsured or underinsured. See Keene Corp., 667 F.2d at 1058 (Wald, J., concurring).

Further, joint and several liability resolves "the problem of indivisible injury . . . simply by collapsing the continuous injury into one year." Carter-Wallace, 712 A.2d at 1121. This is inconsistent with the cumulative nature of progressive environmental injuries. "By permitting a snapshot in time to substitute for the actual timeline (i.e. by excising the selected policy period out of its horizontal time context), [joint and several] allocation denies the uniqueness of long-tail injuries and ignores their cumulative nature." Bratspies, supra at 1247.

Finally, the joint and several allocation method is improvident. It "does not solve the allocation problem; it merely postpones it." Comment, supra at 271. This method "divides the case into two separate suits: in the first suit, the insured selects and sues one of the triggered insurers; in the second suit, the selected insurer then sues other triggered insurers for contribution." Id. In this way, despite its advocates' claims to the contrary, the joint and several method does not decrease litigation costs, does not give courts guidance as to how to allocate liability, and requires insurers to "factor the costs of uncertain liability into their premiums." Id.

Having concluded that pro-ration is a superior allocation method to joint and several liability, we need not, in this case, specify whether the court should apply pro-ration by years or pro-ration by years and limits. According to American Re and not disputed by EnergyNorth, EnergyNorth's claims are defeated under any pro rata allocation method. As American Re explains in its brief:

> On the allocation issue, [EnergyNorth] has never contended that even its highest estimate of damages at the site would be remotely sufficient to exhaust the underlying limits if allocated pursuant to any form of pro rata allocation. . . . Thus, if American Re prevails on . . . [this] issue[ ], [EnergyNorth] would be indemnified (as it has

12

been through settlements) by its primary and lower-layer excess insurers – not by American Re.

While we need not select a particular method of pro-ration in this case, we observe that in future cases, trial courts should, where practicable, apply the pro-ration by years and limits method described in Owens-Illinois for the reasons set forth in that case. If pro rating liability by years and limits is not feasible, trial courts should pro rate by years.

We do not address whether, under either method of pro-ration, the limits of underlying primary policies for one year (vertical exhaustion) or all years (horizontal exhaustion) must be exhausted before an excess insurer such as American Re must pay. See Holmes, supra at 18; see also Jones & Hurwitz, supra at 31-37. The parties have not briefed this issue sufficiently for our review and it is not encompassed in the certified questions. See EnergyNorth, 150 N.H. at 841.

We therefore answer the first two certified questions as follows:

1. When an insurance policy is triggered by the continuous migration of toxic waste that began before coverage commenced and continued after coverage ended, and the evidence will not permit a determination as to when specific property damage occurred, is the insurer jointly and severa[l]ly liable for all of the resulting property damage up to the limits of the policy?
No.

2. If the answer to question 1 is no, how should the insurer's share of any liability be determined?

Some form of pro rata allocation should be used, although given the specific facts of this case, we need not choose a pro rata allocation method because, according to American Re and not disputed by EnergyNorth, any method of pro rata allocation defeats EnergyNorth's claim for indemnification.

Having determined that a pro rata allocation method applies, we need not address the third question certified for our review, and turn now to the final question.

D

The final question certified for our review asks whether a policyholder becomes "immediately entitled" to recover its reasonable attorney's fees and costs pursuant to RSA 491:22-b (1997) by obtaining certain rulings against an

excess insurer that will require the excess insurer to indemnify it if it incurs enough recoverable costs to reach the coverage provided by the excess insurer's policy.

We begin by interpreting RSA 491:22-b. In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. ElderTrust of Fla. v. Town of Epsom, 154 N.H. 693, 697 (2007). When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id.

RSA 491:22-b provides: "In any action to determine coverage of an insurance policy pursuant to RSA 491:22, if the insured prevails in such action, he shall receive court costs and reasonable attorneys' fees from the insurer." We have previously interpreted the phrase "to determine coverage" to include "a determination either of the existence of an insurance contract or that an existing insurance contract covers the particular incident in question, or both." Hodge v. Allstate Ins. Co., 130 N.H. 743, 747 (1988).

We therefore answer the certified question as follows: If the insured has obtained rulings that require the excess insurer to indemnify it, the insured has prevailed within the meaning of RSA 491:22-b, and is immediately entitled to recover its reasonable attorney's fees and costs. Recovery of these fees and costs does not depend upon whether, after all is said and done, the excess insurer actually has to pay any indemnification. The insured becomes entitled to the fees and costs once it obtains rulings that demonstrate that there is coverage under the excess insurance policy.

Although the parties argue about whether there is, in fact, coverage under the American Re policy and/or whether American Re has already stipulated to there being coverage, we do not address these issues as they are not encompassed within the questions certified for our review.

Remanded.

DALIANIS, J., concurred; HORTON, J., retired, specially assigned under RSA 490:3, concurred.